273 So.2d 167 (1973)
Betty Jean STEWART
v.
STATE of Mississippi.
No. 47152.
Supreme Court of Mississippi.
February 12, 1973.
J. Luther Austin, Laurel, for appellant.
A.F. Summer, Atty. Gen., by Wayne Snuggs, Sp. Asst. Atty. Gen., Jackson, for appellee.
SMITH, Justice:
Betty Jean Stewart was tried in the Circuit Court of the Second Judicial District of Jones County upon an indictment charging the statutory offense of pointing and aiming a pistol at one Newell and by discharging such pistol wounding Newell. Mississippi Code 1942 Annotated section 2013 (1956). She was convicted and sentenced to serve a term of four years in the penitentiary. She appeals here.
Appellant and her husband were not on good terms and appear to have been what is sometimes called estranged. Newell was a friend of her husband. On the day of the shooting he and appellant's husband had been drinking since 3:00 in the afternoon. At about 7:00 that evening they returned to appellant's home in a condition at least approaching intoxication. Newell assumed the role of peacemaker and began to tell appellant that she should allow her husband to come back to her. After a few words, appellant produced a .22 caliber pistol and shot Newell through the body. Newell was seriously injured but fortunately, after extensive surgery, he survived.
When the officers arrived on the scene shortly afterward, they found Newell wounded and lying on the floor. The appellant stated that she had shot Newell and went to her dresser from which she took the pistol and gave it to the officers. The pistol contained one cartridge which had been fired and three which had not. Appellant was arrested, and after having received the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), made a brief statement which was taken down by an officer and signed by her. In this statement she gave this account of the shooting:
My friend girl was at my house at 101 Short Ash St. in City of Laurel. My *168 cousin Robt Newell came in and told me Betty he had been talking to Clyde Stewart my husband about coming back home. I told him that if he didn't want to come back home he didn't have to. He said Betty you should not say that and out and shot him with a 22 pistol.
An evidentiary hearing was held by the court as to the voluntariness of this statement. It was shown that before making it, appellant had been duly warned as required by Miranda and that she had not been coerced in any way or induced by promises of any kind to make the statement. Appellant also testified at this hearing in her own behalf. She stated that she had told the officers the truth about the matter, and also said that she had not been abused or mistreated in any manner and that there had been no promises made to her as an inducement to sign the statement. She also said that she had told the officers that she had shot Newell but that she had told them it was accidental.
The principal argument addressed to the contention that the statement was inadmissible, is based upon the proposition that she was incapable of intelligently waiving her rights because she had only a second grade education. There was no evidence, however, that she was lacking in intelligence or mentally retarded. She testified as a witness in her own defense as well as on the hearing with respect to the statement. Her testimony, as reflected by the record, does not indicate a lack or impairment of understanding. And while she said that she could not read and had not understood what she was signing, there was testimony that the statement had been read to her before she had signed it.
Appellant cites Dover v. State, 227 So.2d 296 (Miss. 1969) in support of her argument on this point. But Dover dealt with the case of a defendant with a grossly retarded mentality and consequently impaired powers of understanding and not with one of little education. Obviously, many people who have had considerable exposure to the education process are not intellectual giants. The extent of education is an item to be considered on the question, but it is not controlling in determining the degree of intelligence possessed by a defendant. Appellant's statement dealt with non-complex matters which could be understood by any person with reasonable intelligence and no specialized erudition was required to comprehend it.
The rule is stated at 23 C.J.S. Criminal Law section 828 (1961), that: "... The mere fact that accused was illiterate does not render an otherwise unobjectionable confession inadmissible against the confessor."
In Casias v. State, 452 S.W.2d 483, 488-489 (Tex. 1970), the Texas Court of Criminal Appeals said:
As in Grayson v. State, Tex.Cr.App., 438 S.W.2d 553, it is difficult to see how one accused of a crime may not have sufficient intelligence or mental ability to understand the content of his confession and yet be competent to stand trial, understand the nature of the charge against him and to assist his counsel in preparing a rational defense.
The evidence was sufficient to support the trial court's finding that the statement had been understandingly and voluntarily given by appellant after an intelligent waiver of her rights, and was admissible.
As a witness in her own behalf on the merits, appellant testified as to what happened when she had shot Newell.
A The discussion was about  when he [Newell] came in telling me  he had been out with my husband, and him and my husband were out drinking together, and so he was talking to me for me and my husband to go back together and how to get along and I told him it wasn't none of his business. That was me and my husband's affair.
Q And what happened next?

*169 A And so I really don't know what happened, but I had  remembered having the pistol in my hand and it went off and shot him  accident. (sic.)
Q What were your last words?
A I remembered having the pistol in my hand and it went off and shot him accident (sic). I wasn't intending to shoot him.
Q Did you have any intentions of shooting him?
A No, sir.
On another occasion she testified:
Q Well, about why you shot him or how you come to shoot him?
A I shot him through  by accident. I don't exactly really remember when I shot him. I have black-outs and I am awful nervous.
There is no suggestion anywhere in the record that Newell was doing or attempting to do anything to the appellant when he was shot.
There is no evidence that the pistol was capable of firing without the trigger having been pulled. Nor was anything offered to justify the pointing of the loaded pistol at Newell. Under the circumstances, it became a question of fact for the jury as to whether the shooting had been intentional or accidental. Peacemakers may be blessed but, apparently, they must await their reward in Heaven. One who intervenes in the quarrel of others, especially if the quarrel is between husband and wife, usually finds little appreciation of his efforts, however well-intentioned.
We find no reversible error in the record and the case must be affirmed.
Affirmed.
RODGERS, P.J., and PATTERSON, INZER and ROBERTSON, JJ., concur.